Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States in this honorable court. Good afternoon. This is Judge Charles Wilson, and I am joined by Judge Jill Pryor and Judge Britt Grant. And we are here for oral argument in Kenneth Eugene Smith v. Commissioner Alabama Department of Corrections and the Warden of the Holman Correctional Facility. Robert Grass is here for the Appellant Smith. Edmund Gerard LaCour, Jr. is here for the Commissioner. And I would advise you, Counsel, that Mr. Thomas is the courtroom deputy, and he will advise you when you have two minutes left for your argument. I understand that Mr. Grass has reserved three minutes for a rebuttal argument. So with those comments, I think we're ready to proceed. Mr. Grass, you may begin your argument. Thank you, Your Honor. Good afternoon, and may it please the court. In six days, the Alabama Department of Corrections plans to attempt to execute Kenny Smith under unprecedented circumstances. This will be the department's second attempt to execute Mr. Smith. As far as we are aware, that has occurred only once before in 1947. And this time, the department plans to attempt the first ever nitrogen hypoxia execution. The department plans to do that even though Mr. Smith will not have exhausted a post-conviction appeal challenging the constitutionality of the second attempt to execute him. And even though the department's untested procedures for accomplishing the novel method of nitrogen hypoxia executions expose Mr. Smith to substantial harm relative to feasible and available alternatives. I plan to talk this afternoon about two of Mr. Smith's claims. The first is Mr. Smith's 14th Amendment equal protection claim that he is being treated desperately from similarly situated condemned people subject to execution by nitrogen because the department is planning to execute Mr. Smith before he has exhausted his appeals while 20 other condemned people have exhausted theirs already. The second claim is Mr. Smith's 8th Amendment claim that the department's plan to use the procedures in its protocol for accomplishing Mr. Smith's execution by nitrogen hypoxia would constitute cruel and unusual punishment. The district court committed legal error when it dismissed Mr. Smith's 14th Amendment equal protection claim, and it abused its discretion when it denied Mr. Smith's preliminary injunction motion on his 8th Amendment claim. Both errors require reversal. I'll begin by talking about the district court's dismissal of Mr. Smith's equal protection claim for lack of Article III standing, which the district court made without the benefit of briefing by the parties. The standing elements of injury and redressability are not contested here. The district court's holding turns on its determination that Mr. Smith's injury is not fairly traceable to challenged conduct of the defendants, the commissioner of the department and the warden of Holman. The district court's determination is flawed for two reasons. First, the district court defined Mr. Smith's injury retrospectively rather than prospectively. Mr. Smith's injury is the imminent threat of execution while an appeal from his state conviction petition is pending. That is the prospective injury. If Mr. Smith's execution is permitted to proceed next week, defendants will be responsible for it because they are the state officials tasked with carrying it out. The district court's second flaw is that it conflated Mr. Smith's injury with the right he is asserting. The law is settled that Mr. Smith need not demonstrate a connection between the injury he claims and the rights being asserted. That principle derives from the Duke Power decision in the United States Supreme Court, and I think it's appropriate to briefly discuss the facts in that case because I think they are analogous to our facts. This is Judge Brown. Sorry to interrupt. I know it's difficult on the phone. Before you left your first point, I wanted to ask you a question about that, and that is, do the defendants that were sued have the legal right to not carry out this execution absent an order from the court? Could they choose in some way based on their conception of an equal protection violation or any reason not to do so, or are they obligated to move forward with the execution procedures? Your Honor, I think that they are obligated to move forward in light of the death warrant that the Alabama Supreme Court issued. I do not believe that they have discretion themselves to make a determination that the equal protection violation should forestall the execution. And I guess why wouldn't it be the Attorney General? Go ahead, Judge Pryor. I know. I was going to say, does it matter whether they have discretion or is the traceability question addressed to whether the district court could rectify the injury by enjoining those defendants? Well, I think that's exactly right, Judge Pryor, and your question goes to addressability. The defendants, that is, the commissioner and the warden, are the only ones who can redress Mr. Smith's injury. An injunction directed to the Attorney General would not redress Mr. Smith's injury because the Attorney General is not responsible for carrying out the execution. I'm sorry, go ahead. But the traceability question is a causal relationship, right? Correct. And so the traceability question, going back to Duke Power, Your Honor, there you had plaintiffs suing a nuclear power plant alleging environmental injury to their property. And they challenged the constitutionality of a federal statute, which they contended permitted the power plant to be built in the first place. But the power plant itself had no causal connection to the enactment of the legislation. And the Supreme Court nevertheless held that the plaintiffs had standing to assert their claim against the power plant because their injury was connected to the conduct of the power plant, even if the power plant's conduct was not causally connected to their asserted rights. That is the constitutionally or lack of constitutionality of the underlying legislation. And Duke Power, that principle also explains why inmates in federal habeas proceedings have standing to sue their jailers for alleged unlawful detention, even though their jailers have nothing to do with the underlying reasons why the detention is unlawful. So if there is a federal habeas claim and the allegation is that the inmate receives ineffective assistance of counsel, you can nevertheless sue your jailer because your injury is that you're being unlawfully detained, even though your jailer has nothing to do with the alleged rendering of ineffective assistance. And that same principle applies here. Mr. Smith's injury is the imminent execution, which, if it goes forward, will move his pending appeal, and defendants are the state officials who are going to impose that injury if the execution is permitted to proceed. So his injury, Mr. Smith's injury, that is, is fairly traceable to the defendant's challenged conduct. And in any event, Mr. Smith has standing, even if you trace defendant's conduct retrospectively to the decision in August to move for authority to execute him. As the district court did, and as the defendants argue that he did correctly, defendant's conduct is implicated in the decision to move for authority to execute Mr. Smith in August. And that is what Mr. Smith alleged, and also what the evidence in the record establishes, and that evidence, at least on that portion of the case, is really not disputed by the defendants. So the defendants were parties to Mr. Smith's then-pending action challenging the department's then-stated intention to attempt to execute Mr. Smith a second time by lethal injection. And the purpose, we have alleged, and we think we have established for selecting Mr. Smith when the department did for execution by nitrogen apoxia, even though he has an appeal pending, was to moot the litigation, and thereby spare the defendants from discovery and the disclosure of information that the department does not want subject to public scrutiny. And when they moved in August, they being the defendants, moved in August to dismiss Mr. Smith's then-pending litigation, they represented in a pleading submitted by their counsel, the Attorney General, that Commissioner Hamm had decided that Mr. Smith would be subject to nitrogen epoxy and not lethal injection. So they themselves represented that this was a decision by Commissioner Hamm, and when the Attorney General filed the motion seeking to execute Mr. Smith in the Alabama Supreme Court, he did that to effectuate the Commissioner's determination. And he did that to obtain authorization under Alabama Rule of Appellate Procedure 8D1 for the, quote, Commissioner of the Department of Corrections to carry out the inmate's sentence of death with a time frame set by the governor. So we think the district court got the analysis wrong for the two reasons we've explained, got the standing analysis wrong, that is. Can I back you up for a moment? You did litigate this issue in front of the Alabama Supreme Court, right, at the time that it was making that decision? We objected to issuance of a death warrant on the ground that Mr. Smith's equal protection rights would be violated if he were, because he had a pending appeal. From a Rooker-Feldman perspective, is it appropriate for a circuit court to review the district court's judgment related to your action, or would it have been more appropriate for you to seek review in the United States Supreme Court of the Alabama Supreme Court order setting of execution? Your Honor, the Rooker-Feldman doctrine doesn't apply here. That's what the district court found, and we think the district court got that right. And that is, our argument is basically based on Your Honor's decision in Bair v. Campbell, where Your Honor found that district court should keep one thing in mind when Rooker-Feldman is raised that will almost never apply. And the reason that Your Honor found that, the basis for Your Honor's decision there was that Rooker-Feldman is not intended to deprive the district courts of subject matter over a claim simply because the party attempts to litigate in federal court a matter previously litigated in state court. And Your Honor made clear in your opinion that there may have been some confusion in the law previously where courts were applying a standard that suggested if claims were inextricably intertwined that the Rooker-Feldman doctrine would apply. And in our view, our reading of Your Honor's opinion, your opinion disabused district courts within the 11th Circuit of applying that standard. And we think absent that standard that there's no basis for finding that the Rooker-Feldman applies under these circumstances. And we also cited in our brief to district court decision that Powell v. Thomas, which we think is consistent with Your Honor's decision in Bair, where the petitioner there made the same argument in the federal court as he had made to the Alabama Supreme Court regarding in opposition to the motion for authorization for execution, there the issue I believe was the protocol was inadequate and in violation of the Eighth Amendment. And apparently it made the exact same claim to both courts. And the court there said that the Rooker-Feldman doctrine did not apply. And so we don't think there's any basis to apply the Rooker-Feldman doctrine here. I guess my question was, and I definitely obviously concur in the importance of not having an expansive view of Rooker-Feldman. My concern here is whether possibly this might be in the rare set of circumstances where it could apply if what we're being asked to do is overturn essentially the Alabama Supreme Court's decision that this execution could go forward, even given the equal protection violations, or whether we're being asked to separately review something other than effectively that order from the Alabama Supreme Court. Do you see the distinction that I'm trying to raise between the two? Well, we're not asking for a review of the Alabama Supreme Court's order, and it's not even clear what the Alabama Supreme Court's order means. Well, it's clear in the sense that they issued a death warrant. But aside from the death warrant, there's no explanation of what they did, what they considered exactly. And the proceeding in the Alabama Supreme Court is an unusual one, at least in terms of litigation, in the sense that there's no opportunity for fact development, there's no opportunity to argue your case orally before the Alabama Supreme Court. And so we think our claim is a separate claim for violation of the United States Constitution, which is properly presented to the district court in this case, and can proceed through this court, and if it's appropriate, the United States Supreme Court. Last question, and then I'll let you move on. I know you've got a lot of things to cover. Do you think that you could have sought certiorari over the death warrant or not? Well, Your Honor, we have sought certiorari in the underlying state court petition. Yesterday, we filed a petition for certiorari. That raises the issue that we claim we will not be able to pursue through its full habeas course. And so we have done that. Whether we could file a petition directly from the death warrant, I think, is an open question. In the past, we have filed petitions from Alabama's precourt decisions denying a motion to stay in execution, but I think those are somewhat different procedural situations that don't necessarily apply to the issuance of the death warrant. Thank you. Will you move on to the Eighth Amendment claim? For context, the department took five years to develop its nitrogen hypoxia protocol. By contrast, on August 25th, 2023, all on the same day, Mr. Smith was informed that he was subject to execution by nitrogen hypoxia for the first time, informed that the state was on that same day moving for authority to execute him, and provided with a heavily redacted copy of the protocol for doing so. On November 8th, Governor Ivey scheduled Mr. Smith's execution for January 25th, ensuring that there would be a truncated period to resolve any challenge to the newly released protocol for the first ever nitrogen hypoxia execution with limited discovery on an expedited basis. During that limited discovery, defendants refused to produce any information predating the adoption of the protocol on August 25th, and the district court failed to rule on Mr. Smith's motion to compel production of that information. And I say this not to suggest that the Eighth Amendment standard should change because execution by nitrogen hypoxia has never been attempted before, but to suggest that the department's protocol for accomplishing that for the first time ever deserves more scrutiny than it's received to date. I also want to make clear, because it's a pervasive theme in the defendant's brief, that Mr. Smith has not walked away from his allegation in previous litigation that nitrogen hypoxia is a feasible and available method of execution. Mr. Smith did not walk away from his allegation in previous litigation that nitrogen hypoxia is a feasible and available method of execution. Mr. Smith did not walk away from his allegation in previous litigation that nitrogen hypoxia is a feasible and available method of execution. Mr. Smith did not walk away from his allegation in previous litigation that nitrogen hypoxia is a feasible and available method of execution. And so the Supreme Court has said several times that you are not entitled to a teamless execution, but the Constitution is violated if the execution in and of itself is cruel and unusual. So I guess my concern is that are you able to point to any findings of fact by the district court in its order that are sufficient to establish that the carrying out of this execution by nitrogen hypoxia is cruel and is clearly erroneous? Yes, Your Honor, I think I can. And the issue with the district court's ruling, in our view, is not so much what he found, but what he didn't address. And let me explain. I think there are certain facts here that are undisputed. It's undisputed that a person exposed to an oxygen deficient environment can be left in a persistent vegetative state or experience a stroke. It's also undisputed that face masks are subject to leakage for a variety of reasons. Therefore, it's critical that the face masks used in Mr. Smith's execution will be airtight so that oxygen cannot penetrate the mask in an amount that might cause him serious injury short of death. Now, defendants and the district court say that the mask that the defendants have obtained for use in Mr. Smith's execution will not leak in a manner that exposes Mr. Smith to danger. The problem, in our view, is that that is directly contrary to what the manufacturer itself says in the user's manual that accompanies this equipment. And among other things, the manufacturer says that the respirator must be properly fit to the individual, that it may not provide a satisfactory face seal for individuals. Yes, counsel, two minutes. Thank you. That it may not provide a satisfactory face seal for individuals who have certain physical characteristics, and that an unsatisfactory face seal may result in leakage, which dangerously reduces respiratory protection. And so the manufacturer says, if you're going to wear this mask, you need to do a certain test, a negative pressure seal test to ensure that the mask is sealed. And if you cannot satisfactorily perform a negative pressure test, do not enter the contaminated area. Now, the department has no intention of performing that test at all. And so instead, it says it's going to rely on the flow of nitrogen to push out any oxygen should it penetrate the mask. But the user's manual expressly states that the positive pressure of air in the respirator does not reduce the importance of fit testing, which must be done before the supplied air respirator is selected and used. I've got a question about the record related to this. From what I saw, none of your experts testified to what amount of oxygen leakage would lead to a vegetative state rather than death. Did they? Your honor, they did not, but I also think that it's fair to point out that this is. No, 1 has that data and it would be a shame to figure it out next Thursday, because this is the 1st time this will ever be attempted. There is no data on exactly what's going to happen and how this will go forward. I want to continue to give you a few more minutes. So when we look to the record in this case, what does the record reflect with regard to whether or not there is an intention to have an airtight seal on the mask? Your honor. Because, you know, we're looking at the. We're looking at findings of fact by the district court and the district court said it's highly unlikely that the mask with this large or that the seal would be broken. If it is tightly secured on the condemned inmates head and a positive pressure environment. Why explain to me why how you establish that that's a clearly erroneous finding of fact. Well, in addition to the evidence that the district court did not address, we think it's clearly erroneous because the issue that was addressed. The evidence that the district court did rely on does not get where does not support that finding. And the evidence consisted of a few things. One is personal observations of the district court and the assistance attorneys general that themselves tried on the mask and wore it. And the reason that that is insufficient is because there was no way to tell that the mask was there tight because, with the exception of one assistant attorney general, no one performed the test needed to establish that. In addition, the conditions under which those people wore the mask do not mirror the conditions under which which Mr. Smith will those persons were not subject to execution knew that no nitrogen would ever flow into the mask and they were not suffering from PTSD. Mr. Smith is going to know that nitrogen is flowing into the mask. He's going to know when it's flowing into the mask. And under those circumstances, the reaction of someone is likely to be very different. Someone might hold their breath breath, for example, which will affect their breathing rate and may result in gulping in air under the mask. And if that air includes oxygen. I'm sorry to interrupt you, but if the standard for testing is that it has to be tested on someone who is undergoing execution, then obviously it's impossible to test really any method of execution. That can't be the standard, can it? Well, I'm not sure that's. I mean, I think what you're saying is they haven't tested this effectively because it will be different for someone who knows that nitrogen gas is coming out. But I don't I don't see a way to test that. Well, but they haven't even tested it where nitrogen gas isn't coming out. They've just different arguments than the one you were making, though. I mean, I guess I would say what what would you say was sufficient? Well, your honor, the testing, whether nitrogen or breathing air is coming out of the mask is the same. It involves basically putting your thumb over the hose that is supplying either the breathing air or the nitrogen and taking a deep breath. And the mask should kind of collapse on your face. And that test, you know, these masks aren't made for the use that the department is putting them to. So that test is normally performed with breathing air coming out of the mask. And so no one has really, you know, even even in the examples that they're offering. No one other than one of the assistant attorneys general have done that. And so we are kind of relying on a assumption that everything is going to work as it's intended to work. And your argument, is it your argument that a negative pressure test will advise us as to whether or not it is likely that the mask would dislodge or that the seal would be broken? That's what the manufacturer advises, your honor. And so we think that the manufacturer's advice should hold a good amount of weight. Is that what you're suggesting then? I'm sorry, I didn't hear the question. I'm sorry. I'm sorry. I'll just have to pause and then get to the next thing. Is that is that what you are saying for your client? The sufficient amount of testing would be if it survived that test. Would you be satisfied or would you still seek more? Well, we think that there are ways to avoid all this and that that would get to our feasible and available alternatives. And we've proposed delivering nitrogen through a different mechanism, either hood or closed chamber, which. That's why I'm trying to get you to be specific, because the answer is the assertion. This particular mask hasn't been tested enough or is it this particular mask, no matter how thoroughly it was tested, would not be appropriate. The assertion is that there are better ways to do this than using masks. And what are those ways it would be a hood? That would be a hood or a closed chamber. And so the hood. That's an alternative that you have to show is available. And I think we've said that you've got to show. You must do more than show that it's theoretically feasible. You also have to show that it's readily implemented. And where are we going to find that in this record? I think you're going to find it in the testimony of Dr. And the defendants deposed Dr. And question him extensively on the use of a hood for delivering nitrogen for the purpose of ending life. And that testimony is mostly in the context of assisted suicide. But that that's where. And a hood would avoid the possibility that the inmate while laying back on the gurney with the choke in the event that he vomits. I think the hood would reduce significantly reduce the risk of that issue because for two reasons. One, it's not strapped tightly around your face. So if inmate vomits, there's some place for the vomit to go rather than right back into the inmate's mouth and potentially down down the inmate's airway. And that's the testimony. Yes. Okay. Judge Wilson, may I ask another question? Yes. I want to go back to this point because I think it's important with regard to whether the mask is airtight. Is your argument that observing that the mask is tight or that it's not being dislodged with various movements is a different question from whether the mask is airtight. And that there was no evidence before the district court from which it could conclude that the mask is actually airtight. Is that your argument? Yes, Judge Pryor. That's that's our argument. There is a limit to what anyone can determine by observation alone. And so, for example, if the mask completely fell off an inmate's face, obviously corrections officers in the execution chamber would see that. There may be situations where the mask became obviously askew. But I think even Dr. Antonini, who is the plaintiff, excuse me, I'm sorry, served as a defendant's expert, testified that observation might detect large gaps, but it wouldn't necessarily detect smaller gaps. And so I think the notion that execution officials are going to be able to fix anything that happens is. Again, maybe a bit of hopeful thinking, because I'm not sure that there's no evidence that they're trained to do that or that even if they're trained, that observation can correct everything that might happen there. And in addition, once the nitrogen starts flowing there, the department has asked the not ask, they've warned a spiritual advisor if one is in the chamber to stay three feet, at least three feet clear of the mask. And although Ms. Stuart Riley said, notwithstanding that, corrections officers would adjust and fix the mask if something happened while nitrogen is flowing. None of those corrections officers testified and none have even been identified.  Okay, and I just want to ask a question to both. Let me just ask one more question. So, would a negative pressure test resolve the concerns that Mr. Smith might have about the mask malfunctioning during the execution? Your honor, we are our position is that the better alternative is to use a different means of delivering the nitrogen. And that would effectively mean, rather than having the tubing run through a mask, having the tubing run through a hood. And we think that's feasible. We think they can do it. We think they question Dr. Nitschke extensively on it. And it's readily implemented? It's readily implemented. Theoretically feasible and readily implemented. And does the record reflect that it's readily implemented? It's readily implemented by people who wish to end their lives voluntarily. Okay. I got you. I'm sorry, Judge Jones. May I ask one more question? You have some more questions. Yes. Thank you. It's always challenging on the phone, as I said. I appreciate it. I have a question about the alternatives. Doesn't the record indicate that the hood would have the same possibility of oxygen leakage through the neck band as the mask does? Your honor, I don't think that's the case. I think that's, in fact, the reason why masks have been abandoned in the euthanasia context is because there was leakage from masks and the hood seemed to solve that problem because the hood has a larger volume to introduce the nitrogen into. And because the hood extends below someone's neck and, therefore, the oxygen is not necessarily coming in right near your nose or mouth. So what about the data that some of the experts issued about how long the process would take given various levels of oxygen and nitrogen? Why don't those establish that even if there were some leakage, it's not likely that it would cause the problems that you're identifying? Your honor, the reason we think that that evidence doesn't establish and support the district court's finding is because we think it's circular. What Dr. Antonini basically said is that with a virtually airtight mask, an inmate would be unconscious within, I think he said, around 30 seconds and dead within minutes. But that begs the question of whether the mask is going to be airtight. And as we indicated in our brief, there really is no – we are not disputing that a person exposed to pure nitrogen will be rendered unconscious in a fairly short period of time and ultimately die. That's not the issue. The issue is whether the procedures that the department is proposing to use will accomplish that in the time periods they're claiming. And Dr. Antonini's evidence on how long it would take, we think, assumes the fact and dispute. And I wondered also about – I'm sorry, I apologize, Ms. Wilson, if I may, just one more. I wondered about the closed room option. I would assume that that would present potentially some RLUIPA arguments about not being able to have a spiritual advisor in the room. Is that something that's separate and apart from your view of an alternative method? Or how do those things interplay? Well, I think in some ways it's the same – it would cause the same issue that the department's protocol causes. Because once the nitrogen starts flowing, the spiritual advisor is advised to be at least three feet away from the mask. And you're correct, Your Honor, that you cannot put a spiritual advisor – certainly can't do it safely – put the spiritual advisor in a closed chamber filled with nitrogen. But you can provide some procedure for the spiritual advisor to communicate and to serve a condemned inmate before the inmate is placed in the closed chamber filled with nitrogen. Thank you. All right. Thank you, Mr. Grass. You've reserved three minutes for rebuttal, and you'll keep that time. And we'll hear from Mr. LaCour on behalf of the commissioner. Thank you, Your Honor. Thank you, Judge Wilson. May it please the court, Edmund LaCour on behalf of the defendants. Alabama has adopted the most painless and humane method of execution known to man. Dozens of condemned inmates have expressly chosen nitrogen hypoxia, and Smith has been asking for it since 2022. In now challenging nitrogen hypoxia, Smith had the heavy burden to show that he's sure or very likely to suffer severe pain, a pain that a viable alternative would significantly reduce. Instead, he brought an advocate of nitrogen hypoxia, Dr. Nitschke, as his expert. And Dr. Nitschke has helped countless people commit suicide using nitrogen hypoxia. This is all in the record. According to Dr. Nitschke, hypoxia, quote, ensures an almost immediate loss of consciousness with death following soon after. That's Doctrine entry 62-53, paragraph 14.1. He said he's personally observed dozens of suicides by nitrogen at the 62-112, page 22, and he has never observed physical pain in these dozens of suicides. And keep in mind, these suicides are people who don't have a third party assisting them because that third party could then potentially be criminally liable for assisting in the death. And despite the do-it-yourself mechanism, he has never observed physical pain. He testified that the method provides a peaceful and reliable death. And when Alabama announced its method was available, Dr. Nitschke tweeted that critics were, quote, misrepresenting the science. Nitrogen hypoxia is, quote, fast, effective, and with no risk to others, close quote. You can find that tweet at Doctrine entry 62-101. He also stands by it in his deposition testimony. Judge Wilson, doesn't the manual reflect that the mask has to create an airtight seal when placed on the face and tightened? Your Honor, that is certainly what is recommended by the manufacturer before someone uses the mask to go into an environment for a prolonged amount of time where there's going to be nauseous fumes or otherwise dangerous gases. But it's never been the position that it must be perfectly airtight. And it's somewhat strange for Mr. Smith to be arguing that it must be airtight when his alternative is a bag over the head that Dr. Nitschke has said is going to essentially allow some oxygen in. There's no way to allow oxygen to flow into the bag, or nitrogen rather, to flow into the bag if the bag is indeed airtight or the bag is going to explode. So there is going to be some gap necessarily. The difference between the bag method that he's proposing here that Dr. Nitschke has used or watched other people use to affect painless suicide dozens and dozens of times is that our method with the mask has a one-way valve. So oxygen can flow in and indeed does flow in at a very high rate, a higher flow rate than Dr. Nitschke's proposed alternatives. And as he explained, the high flow rate makes it impossible for air to come back in. And that's Nitschke at the hearing at page 127 of the preliminary injunction hearing transcript. So if you look to the Antonini Declaration at 62-60 paragraph 10, you'll see that our flow rate is much higher than the one that Dr. Nitschke uses and has found sufficient to keep out any air or at least too much air such that the nitrogen hypoxia could potentially create that severe risk of substantial harm. And so he's come up wealthily short even by his own evidence. Again, Dr. Nitschke, by his, again, Smith's own expert, rebutted Smith's concerns about the mask. In his declaration, he stated that the problem for suicides is that it requires the cooperation of a third party to intervene via reposition or apply manual pressure to the mask. Alabama, of course, doesn't have that problem. We'll have Department of Corrections officers on hand to ensure that the mask maintains its proper position on the face. Dr. Nitschke had the opportunity to wear the mask, and he said it was a fair fit and it was not loose, especially after it had been adjusted. You'll see that in his deposition testimony at pages 41 through 42. Just based on Smith's evidence alone, the court can affirm the well-reasoned factual findings from the district court. But, of course, that wasn't all the evidence. The district judge himself, he didn't really physically inspect the mask, did he? Yes, he did, Your Honor. He held it in his hand, and that's reflected in the district court's decision. This is a large mask with a rubber seal that goes from the forehead around the face and down to the chin. It has five sturdy straps that can be pulled tight to lock in a very tight fit. And, I mean, Dr. Nitschke found that as well, and that's why the district court, upon his personal observation, and this is the sort of thing that courts of appeals should defer to when we're dealing with findings of fact like this, he found it very unlikely that oxygen was going to get in at sufficient levels to cause any problem. And that brings us to another problem that Judge Grant alluded to when my friend on the other side was up. No one testified about what amount of oxygen getting in would be sufficient to create that substantial risk of severe harm, nor did they testify about what the likelihood is that some amount of oxygen is going to get in and create that severe risk of substantial harm or substantial likelihood of severe harm. But, again, we know from Dr. Nitschke that dozens of people have used his bag method where there's not that airtight seal, and he has never seen anyone suffer pain despite having seen dozens of people use nitrogen hypoxia to end their lives. So he already had a very high burden to surmount when it came to approving his Eighth Amendment claim, and this is where the claim rises and falls with the Eighth Amendment claim. I'm not sure I understand why the commissioner cannot perform a negative pressure test on the mask that will be used to execute him. First, I don't think that's the Eighth Amendment standard. The Supreme Court has said that federal courts under the Eighth Amendment are not empowered to be boards of overseers of state execution methods, and that some level of deference is entitled to states. But another reason why one might not want to do that, the negative pressure test requires cutting off oxygen or cutting off any air for a moment while the person is wearing the mask. Think of a scuba mask except it's covering your entire face. Cutting off oxygen to see if that sucks in on the face or not, and understandably, that might be disconcerting to an inmate. And so there are valid penological reasons why the state might not want to add that particular step into the process. But we have conducted negative pressure tests, just not with Mr. Smith himself. If you look to the House Declaration 62-71, paragraph 3, he testifies and he declares, I was able to collapse the flange of the face piece onto my face, indicating an effective seal. And you can look at the video at 62-79 to see that, what he's declaring or testifying to. So we've had people do that negative pressure test. And again, this is a mask that is approved by the NIOSH federal agency, which in order to get that approval, needs to have a fit that is appropriate to various faces. Indeed, it's been tested on people of different sexes and of different sizes and different levels of facial hair. On top of that, we have, again, Dr. Nischke himself saying that it was not loose. Even when he was flexing his face to try to make it loosen up, it was still not loose after that. And then when it was adjusted, it fit better. The other factor that weighs against them, again, coming from Smith's own experts, Dr. Young, the anesthesiologist, the way he usually ensures that there is a sufficient fit when he's working as an anesthesiologist, and the stakes are relatively high to make sure that sufficient gas is getting provided to his patients, is just putting his hand on the mask and holding it on. Of course, we're going to have officials in the room who are going to be positioned to be able to do that if necessary, to ensure that the fit is there. And Dr. Nischke himself, trying to find, he said, a reliable way to deal with the issue of the sealed face mask is through the cooperation of a third party, like an assistant. And that comes from his declaration. And you can find that at 62-53 on page 5. So there is just no way I'm going to compare or review. Does the protocol call for the mask being held in place by someone from the office of the commissioner? I don't believe the protocol says that someone will be holding it in place the entire time, but there will be someone there, and the evidence is that someone will be available to refit it if necessary. And then keep in mind, again, we have Dr. Nischke himself saying that with his bag method, the high flow rate makes it impossible for air to come back in. That's the hearing at page, the PI hearing at page 127. And again, that's with a relatively loose fit around the neck. Here we have a one-way valve. So we've got a tighter fit than their supposed alternative. I think Mr. Grass said that it would be airtight. That's just simply not right. The deposition, Dr. Nischke, he said it is, quote, not a tight fit. That's at page 30 of his deposition. And Dr. Antonini likewise testified that oxygen would be able to get in because of gaps through the hood method. But again, the evidence is even if there's not an airtight seal, that people are going unconscious within a matter of seconds. If you look at the Ogden study, I don't have the exact slide in front of me right now, but this was sort of a case study that the experts looked at of four people in Switzerland who were using sort of a mask to carry out nitrogen hypoxia on themselves with no assistance whatsoever. And even though the report said that there were visible gaps that you could see in the video, each of the four people was unconscious within under a minute and was dead for freedom within just a few minutes. And one lasted a little bit longer, but there was no indication of any suffering or pain, much less the substantial likelihood of severe harm. So Mr. Smith had a high burden. He has come up woefully short. I think if all we had was his evidence, we would have almost definitively disproven his case. Mr. Smith's concern is primarily. Oh, sorry. Go ahead, Jill. I have a question about the record on the point you were making about the airflow. First of all, in the protocol, there's nothing addressing the rate of flow of nitrogen into the mask. Is that right? I believe there is, Your Honor, in the redacted copy. I don't have the exact site at my fingertips, but I may be able to get it for you in just a moment. Okay. Did the district court make any factual finding on that, what the flow rate would be? I'll have to go back and look at that, but if you look at the unredacted protocol, it's document 62-3. You can find the flow rate at paragraph XA2, and it is several times higher than the flow rate of Dr. Nitschke's post-bag method. What does it say the flow rate is? It's redacted for security purposes. So since this is a public feed, I'd rather not say it, but I can if that's required. But you will see it there. Okay. I thought a witness testified, though, that the nitrogen would flow into the mask at 70 liters per minute, regardless of what the protocol says. Yes, well, 70 liters per minute is in the record, yes. And Dr. Nitschke, I think, said he was going at 15 liters per minute for his bag method and found that to be sufficient to keep air from coming back in. It's similar to if you blow up a balloon and you let it go, there will be air transfer, but it's going to be from the balloon to the external environment, not from the outside into the balloon. So it's a similar principle physics. Just one more question about that. So when you did the demonstrations, according to the record, a flow rate of 90 liters per minute was used, and that's what Dr. Antonini said. Can you explain the discrepancy between the 70 liters and the 90 liters per minute? My understanding, Your Honor, is that the protocol, and I think this is redacted, but I want to answer your question, states 70 liters per minute or flood, and that the flood function is basically sufficient to take that up to 90. Dr. Antonini says that whether it's 70 or 90, it's still several times higher than Dr. Nitschke's proposed flow rate of 15 liters per minute. And this is a mask that holds about 1.4 liters of air, so we're talking more than a liter of air per minute flooding the mask, which is why the oxygen levels drop precipitously, leading to very swift unconsciousness and then ultimately death. And so execution by nitrogen hypoxia using a hood instead of a mask, could the state carry that out relatively easily and reasonably quickly? Your Honor, I'm not certain about that. I don't think this hood approach that they proposed meets the Nance and Buckley standard of the variable blueprint needed. I'm not aware. I know you, Mr. Graf, can correct me. Why doesn't it meet the standard? Well, I'm not aware that they've actually proposed a different type of bag. So they had an alternative mask, for example. The Mojo 2 was essentially a CPAP mask, and they abandoned their mask challenge when they saw that our mask had a tighter fit than the one that they were proposing. But I don't think they have an alternative hood that they proposed. If you do this, this will work. And while we're on the subject of the hood, again, it's not airtight. So that was a mistake my friend made a moment ago. And then, Judge Wilson, I think you asked whether the vomit risk would be reduced by the hood. Dr. Nitschke did not testify that the hood would substantially reduce the risk of vomit. Rather, in his declaration, again, 62-53, page 9, he said the risk of vomiting was still present with the hood. So if this alternative is supposed to substantially reduce risk, it comes up short. Wasn't the idea that if he did vomit, there would be somewhere for it to go in the hood, whereas there would not be somewhere for it to go in the mask? I certainly don't see that in Dr. Nitschke's declaration. I saw that in a reply brief, but without any citation to the record. So maybe there's something in the record I'm not seeing. But if their theory is that there's going to be so much vomit that it's going to fill up a 1.4 liter mask, there's certainly not evidence in the record to substantiate that either. So then under the first prong, they failed. And second, and this is again why the district court correctly found that this entire claim is speculative, there's no hard testimony as to the substantial likelihood that he's going to vomit at all, much less evidence suggesting that he is substantially likely to vomit at very few seconds between when nitrogen floods the mask and when he is unconscious. Which, as an expert said, could happen in just one breath. Evidence of nausea is not necessarily evidence of vomiting. Dr. Porterfield testified about the nausea that Mr. Smith has been suffering, but said that she was unaware of him suffering from vomiting since she's been seeing him. And then finally, when it comes to vomiting risk, too, if you look at the video evidence, the inmates are not laid flat on their back. They're at an incline. Video document entry 62-73, for example, shows someone strapped to the gurney who's able to lift his head up, even off of that incline, to a degree that would further mitigate risk from vomiting. And then finally, risk from vomiting could be minimized if Smith simply opts to have his last meal earlier in the day or the day before the planned execution. And so, for all these reasons, he's not established either prong of the Bayes-Glossop-Bucklew test, and the district court certainly did not clearly err or abuse its discretion in denying a preliminary injunction here. If he were to vomit, is there any criteria in the record for whether or not Commissioner Hamm would stop the execution? So, it breaks down to whether or not nitrogen has begun or not. If nitrogen has not begun or not, the undisputed evidence is that mask will be removed, and the vomit will be cleared, and then the mask will be reset after it's been cleared and cleaned, and then the execution will begin at that point. All right. Hold on. But then, if nitrogen has begun, then the evidence is that the state does not plan to stop the execution if they see vomiting because, again, there already has potentially been a large amount of nitrogen introduced into the inmate's system. And so, similarly, with lethal injection, you have inmates who are strapped down to the gurney, and if you've begun to inject the drugs and then there's vomiting, you wouldn't want to stop at that point. So, if he vomits during the execution with the mask on, you're telling me that the state will not stop the execution? They will permit him to choke on his vomit? Your Honor, I don't think there's substantial risk that he will be choking his vomit, particularly if he's – and certainly not in a way where he's going to even feel any pain because, again, the onset of unconsciousness can be almost instantaneous if you go by his own expert's testimony, and everyone seems to agree that it's going to be a matter of seconds, not minutes. And so, then what we're dealing with is, as the district court put it, an unlikely cascade of events that, if everything goes precisely wrong, then, yes, there is some theoretical risk. But if some theoretical risks were enough to establish an Eighth Amendment violation, then the death penalty would be nullified across the country. That's not the test, and no method of execution claim has ever prevailed at the U.S. Supreme Court because it takes a whole lot more than what Mr. Smith is bringing in this case. So if we can, I'll turn briefly to the Equal Protection Clause issues. Judge Grant, you've made this point. The issue was litigated in front of the Alabama Supreme Court. The rule, Rule 8D, says the Alabama Supreme Court shall, at the appropriate time, enter an order authorizing the commissioner to carry out the inmate's sentence of death. So the issue in front of the court is, is it an appropriate time or not for this execution to move forward? Mr. Smith came forward and said it is not an appropriate time because of the Equal Protection Clause, that you should wait. But the Alabama Supreme Court rejected that argument necessarily when it entered an order, not just a death warrant, but an order that concluded that it now is an appropriate time to carry out the sentence. So if he wanted to challenge that decision of the Alabama Supreme Court under 28 U.S.C. 1257, he had one option. That was to take it to the U.S. Supreme Court, not to take it to the Middle District of Alabama or to this court that is a jurisdictional bar on him raising that claim now. It also explains why this is such a strange scenario when you've got him suing the commissioner and the warden for purportedly, for biased decision making in terms of when it's appropriate for him to be executed, when they have no relation whatsoever to that decision. And so we do think the district court was correct to find that there was a lack of traceability, lack of traceability and understanding to the challenged conduct. But even if there were traceability… What's your response to the Duke Power argument that he's being injured by the actions that they're taking? Well, Your Honor, I think if that's enough to warrant standing for him, then I think he's jumping from the standing frying pan into the habeas fire. If he's suing his jailer for merely holding him, well, that's habeas. That's when you get to sue your jailer. So if you have a Batson claim or if you have a selective prosecution claim, you don't sit on your rights and fail to appeal the district court or the trial court's denial of your Batson claim and think, well, good thing I've got 1983 to sue the jailer after I get sent to prison. You have to appeal it. You have to take that to the Supreme Court. So it's either a Rooker-Feldman problem, which we think it is, or his 1983 claim is actually a habeas claim, and that's also going to doom his claim because this is second or successive. And if it's not, there's still going to be exhaustion problems because he hasn't presented this to state courts. If he has presented it to the state courts, he presented it to the Alabama Supreme Court, which rejected the claim, and therefore, Rooker-Feldman kicks in and should take that up to the Supreme Court. And that's before you can consider the claim preclusion and issue preclusion issues that we've also briefed up where, again, you've got the issue in front of a court of competent jurisdiction. He had a full and fair opportunity to litigate it, and he lost. So he doesn't get to raise it again in a 1983 suit. He suggested before that the Rule 8 procedures are unusual and that there's no opportunity for argument or for fact development. That's not at all clear based on the text of Rule 8d, which in addition to saying the court shall at the appropriate time enter an order authorizing the execution, it says that the Supreme Court may make other appropriate orders upon disposition of the appeal or other review. So that reads quite broadly to me. I'm not aware of many cases where much more has happened beyond this round of briefing like what happened in this case, but I think that also just reflects sort of the oddity and the improper nature of the equal protection claim he's bringing here, which, again, he's asking a federal court to stay his execution so he can pursue state court proceedings. But he's never asked any of the state courts to stay his execution so he can pursue his state court proceedings. So I think it's this sort of runaround he's been trying to execute. And so it's either a standing problem, a Rooker-Feldman problem, a habeas problem, or a preclusion problem. But any way you look at it, he's wrong on at least one of those. We can't be wrong on all of them. But even if you do get to the merits, Smith fails on his equal protection claim on the merits as well. Of course his petition is second or successive. It is literally his second Rule 32 petition. Now, he asserts that we have this policy of not allowing – or of not setting anyone for execution, not moving for execution of anyone until all their conventional appeals have run. But we have obviously set people for execution when they have had a second or successive petition pending. We cite a couple of those cases in our blue brief – I mean the red brief, and this court obviously can take judicial notice of those. And there's not really any response he has to that. His Rule 32 petition is not his first Rule 32 petition. And under a Rule of – he says, well, maybe it's not really successive in some other sense. But under Alabama Rule of Criminal Procedure 32.2b, which defines successive petitions, it says, If the petitioner has previously filed a petition that challenges any judgment, all subsequent petitions by that petitioner challenging any judgment arising out of that same trial or guilty plea proceeding shall be treated as successive petitions under this rule. So under Alabama law, it is successive. There is no policy of waiting until the second, the third, or the 30th state habeas petition has run out before we set someone or move to authorize someone for execution. If that were the policy, then any inmate could forever delay his execution by just simplifying petition after petition, even on the eve of their execution. And we'd have to wait until the state court had had time to dismiss the petition, and he's gone through a full round of appeal. That makes zero sense, and we've shown that is not the approach that we take. And he, again, suggests that's not – Two minutes. Thank you. Second, he suggests that he is similarly situated to inmates who have elected nitrogen hypoxia, but as he admits in his second amendment complaint, he did not elect nitrogen hypoxia, so he is not similarly situated to those inmates. And it makes sense, too, that we would treat someone who did not elect nitrogen hypoxia differently from someone who did. Otherwise, we'd be inviting other inmates who opted not to elect nitrogen hypoxia to sue us, as Mr. Smith has, with hopes of undoing their failure to elect and then being – having their execution delayed much longer than otherwise would be. So that's a rational basis right there, and that's enough. And then kind of returning once more to this notion that his successive petition might be literally successive but not really successive because it has some merit or it arose later and it's based on new facts. I would think that would doom his claim under the Supreme Court's inquest decision from 2008, which recognizes that any inquiry that by its nature involves discretionary decision-making based on subjective individualized assessments cannot be subjected to an equal protection class of one claim. Yet Smith would have the commissioner of the warden conduct an inquiry into the merits of someone's second or successive petition to see whether or not it's one that should delay his execution further. That is subjective sort of inquiry, and the inquest forecloses that kind of approach. So if there are no further questions… I have actually one question on the RLUIPA issue. Why not offer, as a part of the protocol, a reasonable amount of time for an audible religious exercise before the mask is placed on an inmate's face? Your Honor, the evidence is that he can audibly pray with the mask on. So we think that there is no burden on his religious exercise or his desire to audibly pray. And then, of course, the district court found that any fear that any fear was going to be a problem, any fear of causing a persistent vegetative state or stroke, if he were to audibly pray by dislodging the mask merely through speaking, was purely speculative, and speculative fears cannot amount to burdens. And so we think that that fact-finding by the district court was obviously correct and certainly not clearly erroneous. Finally, I'd just like to close that often the coverage of these last-minute challenges to executions seems to proceed on the premise that the only victim in these cases is the man who violently ended the life of his innocent victim. But I'd just like to remind the court it's been 35 years since Kenneth Smith brutally murdered in the Senate, 35 years where families have to wait for justice. And it's in 2022 that Mr. Smith first assured federal courts that he had a readily available and feasible way to face his justly earned sentence via nitrogen hypoxia. It's time he received the sentence that he's asked for and that he has earned. For that reason, we think that the clearly and well-supported factual findings of the district court and that court's well-reasoned judgment should be affirmed. Thank you, Mr. LaCour. Mr. Grass, you've reserved some time for rebuttal. Thank you, Your Honor. Just a few points very quickly. On the issue of asphyxiation, we will be supplementing the record because last night Mr. Smith informed us that he has been vomiting for about a week. And yesterday he saw the medical staff at Holman who prescribed Zofran for his symptoms. This is consistent with what Dr. Porterfield testified, that as he gets closer to his next execution and continues to re-experience what happened to him in November, that his symptoms are likely to worsen. And ADOC or the department will, in fact, do nothing once nitrogen is flowing into the mask to alleviate anything due to vomiting into the mask. And that itself is cruel and unusual punishment. Let me just ask you quickly about that. Is there a different risk of vomiting if the execution takes place with a hood instead of a mask? Your Honor, there's not a different risk of vomiting. There's a different risk of the potential effects of the vomiting if the evidence takes place with a hood instead of a mask, because the vomit can leave the hood as opposed to a mask. If you're lying prone, there's really no place else for it to go but back into your mouth and potentially into your airways. And so that's the difference in terms of vomiting between using a mask and a hood. With respect to... Mr. Ross, excuse me, did you make the state aware of this new information prior to sharing it with us right now? Your Honor, we just learned about this last night, this morning. My co-counsel emailed the Attorney General, or I should say the Assistant Attorney General, who has been primarily representing the defendants in this case, informed them about this. And we asked for the medical records of Mr. Smith's visit with the medical staff at Holman yesterday. So that information, that was shared earlier today prior to the argument? It was shared earlier today with the Assistant Attorney General, who is primarily responsible for representing the defendants in the underlying 1983 action. I also wanted to address the reference to the Ogden study. If you look at the Ogden study, there was one of the people there, one of the subjects of the study, who had took 40 minutes to become unconscious and die. And Ogden, in fact, as a conclusion of the study, says that people should not be using masks in the context of assisted suicide because they don't reliably create airtight seals. So I don't think the Ogden study supports the defendant's view of what's going to happen here. Finally, there was a lot of discussion about Dr. Nitschke. I commend the panel to Dr. Nitschke's declarations. There are two in evidence and to his testimony at the hearing and to his deposition. There's a difference between offering the opinion that nitrogen can, in fact, end life and can do so in a relatively peaceful manner and suggesting that it will do so in the context of the protocol that the department is intended to use. Your time has expired. Thank you. All right. Well, thank you, counsel. We appreciate your making yourselves available for this argument this afternoon, and we will take the matter under advisement. And so the court is now adjourned.